UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ARG INTERNATIONAL, AG, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 4:20 CV 580 JMB |
| OLIN CORPORATION, | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Olin Corporation's Motion for Summary Judgment (Doc. 25) and Plaintiff ARG International, AG's Partial Cross-Motion for Summary Judgment (Doc. 32).[1]  For the following reasons, Olin's Motion is **GRANTED in part and DENIED in part** and ARG's Partial Motion is **DENIED**.

**I.      Factual Background**

The following facts are undisputed except where indicated.

Olin, a Virginia corporation with its principal place of business in St. Louis, Missouri, sells commercial grade 50% Sodium Hydroxide solution, commonly known as "caustic soda," which is used to produce aluminum (Olin's Statement of Uncontroverted Material Facts ("SUMF"), Doc. 27, ¶ 1).  ARG is a Swiss trading company that focuses on aluminum and its components and products, including caustic soda (Olin's SUMF ¶ 2).  Since 2016 to April 2020, ARG purchased caustic soda from Olin (ARG's Statement of Additional Uncontroverted Material Facts

---

[1] The motions can be resolved on the papers.  Accordingly, ARG's request for oral arguments is **DENIED**.

("SAUMF"), Doc. 31, ¶ 13). Olin sold caustic soda on a "spot" basis, which is a one-time or short time period transaction, or based on a longer specified term (ARG's SAUMF ¶ 13).[2]

In March 2020, Olin's Daniel Garber engaged in discussions with ARG's Zach Mayer to purchase 4 barges worth of caustic soda (Olin's SUMF ¶¶ 3, 6; Doc. 27-3). The primary mode of communication was through an email exchange. On March 18, 2020, Garber emailed Mayer: "I did want . . . to see if we were still in agreement for April barges to ARG at Cash In Advance, $220 per Dry Metric Ton ["DMT"] delivered. 4 or 5 barges?" (Doc. 23-7, p. 5). In response, Mayer indicated that he needed to speak to Matt (i. e. Matthew Lucke, the owner of ARG) and that he would get back to Garber (Doc. 23-7, p. 5).[3] On March 26, 2020, Garber and Mayer had a telephone discussion about the purchase of caustic soda and Garber sent a follow-up email stating that Olin can commit up to 4 barges in April but that the price increased to $254 per DMT (Doc. 27-3, pp. 7-8; ARG's SUMF, Doc. 34, ¶ 52). The email stated in part:

> Good news: We can make a few shifts and commit to up to 4 barges for April. Pay as you go, no need to commit to entire PO[4] up front. If you take 3 barges instead of 4 – no problem.
>
> Bad news: We have to look at an increased value for these shipments based on multiple market dynamics but can offer them at $254.00 per DMT delivered.
>
> . . . . Please give me a call back to discuss these items as needed . . . . (Doc. 27-3, p. 8)

---

[2] Olin sold caustic soda to ARG in July, 2019 on a spot basis pursuant to an unsigned "Standard Terms and Conditions" document (*See* Doc. 31-9, pp. 5-8). Olin also sold caustic soda to ARG in December 2016 and March, 2017. According to ARG, there was no signed contract related to those transactions (Zach Mayer Declaration, Doc. 34-4, ¶¶ 7, 8; Matthew Lucke Declaration, Doc. 31-2, ¶¶ 11, 12).

[3] While not material or disputed, Garber sent an email to Mayer at 4:38 p.m. on March 18, 2020. The email that appears to be in response is time stamped 3:55 p.m., an apparent impossibility. Subsequent emails on March 24 and 26, 2020 make clear that no agreement was reached regarding the purchase of caustic soda at that time.

[4] Purchase Order.

Mayer then relayed the new price to Lucke via email (Doc. 34-21, p. 2).  The next communication is disputed: Mayer avers that on March 27th, he telephoned Garber "to communicate that ARG agreed to the deal" (Zach Mayer Declaration, Doc. 34-4, ¶ 20).  While Garber acknowledges that he spoke to Mayer on March 27th, "[a]t no time on the . . . telephone conversation, or at any time thereafter, did Zach Mayer communicate to me that ARG agreed to any specific deal, that ARG accepted Olin's offer, or that ARG was committing to purchase Caustic Soda from Olin" (Daniel Garber Declaration, Doc. 39-10, ¶ 4).[5]

On April 2, 2020, the parties exchanged the following emails:

**From Garber to Mayer**: It is my understanding our supply chain has been contacted regarding the first barge for April being requested for next week.  Please send PO for this order at $254/DMT, cash in advance payment term and we will begin processing (Doc. 27-3, p. 12).

**From Mayer to Garber**:  Please send me your contract draft for my review whenever convenient.  Once we have agreed on contract terms and wording, I'll be able to send you ARG's PO (Doc. 27-3, p. 11).[6]

In Garber's next email to Mayer, he attached an unsigned contract for the sale of approximately 4000 DMT of caustic soda contained in 4 barges at $254 per DMT to be delivered to ARG's facility in Burnside, Louisiana (Doc. 27-3, pp. 13-15).   Mayer did not respond to that email, did not return a signed copy of the contract, and did not send a PO to Garber.  On April 3rd, approximately 24 hours after sending the draft contract, Garber sent another email to Mayer:

Things are changing quickly . . . .  I have been given instructions from senior management to pull this offer off the table unless there is an agreement for Olin to

---

[5] On April 1st, Garber indicated to Todd Tessier, Olin's Marketing Director-Caustic Soda, North America, that ARG "will be taking the barges in April and likely will need product in May as well . . . ." (Doc. 31-24, p. 2).

[6] Again, the time stamps on these emails are curious.  Garber's email to Mayer was sent at 7:42 p.m. and Mayer's response to Garber was sent at 2:14 p.m.  It is unclear how that time discrepancy can be resolved, but neither party addresses it or challenges the timing of the emails.

Page 3 of 13

receive the outstanding balance due (discount offer of 23% still exist) (Doc. 23-7, p. 11).[7]

Three weeks later, on April 27, 2020, ARG filed suit alleging: specific performance (Count I), breach of contract (Count II), anticipatory breach of contract (Count III), and promissory estoppel (Count IV). ARG seeks damages and injunctive relief.

## II.   Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Rule 56, a party moving for summary judgment bears the burden of demonstrating that no genuine issue exists as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once the moving party discharges this burden, the non-moving party must set forth specific facts demonstrating that there is a dispute as to a genuine issue of material fact, not the "mere existence

---

[7] At the time of the negotiations to purchase caustic soda, Olin and ARG were also engaged in discussions about ARG assuming the debt of LAlumina, a separate corporate entity in which Matthew Lucke has a majority interest (through another entity, Arthur Metals) and Mayer has a minority interest (again through Arthur Metals) (Mayer Dec., Doc. 34-4, ¶ 12). Thus, prior to Garber's April 3 email to Mayer, Tessier sent the following email to Garber:

> Need your thoughts on walking us out of the ARG/Lalumina barges for April. It is spot, monthly and my preference is to cancel them ASAP. You can tell them that this was ordered down from above you but with the outstanding debt they see OK hanging us with ($1.2 MM), announced facility closure, and lack of contract which we pushed for over a year with them, you have been directed to pull back on supply until we fully recoup all funds owed.
>
> I know they will point out that our debt is with LaLumina, and use shell companies (ARG vs LaLumina vs Arthur Metals) as an excuse for their lack of liability on the debt.
>
> We need to protect Olin's contract interests and 4 barges to them in April is not doing that.
>
> Interested in your thoughts.

(Doc. 31-28, p. 2).

of some alleged factual dispute." Anderson, 477 U.S. at 247. The non-moving party may not rest upon mere allegations or denials in the pleadings. Id. at 256. "Factual disputes that are irrelevant or unnecessary" will not preclude summary judgment. Id. at 248.

The Court must construe all facts and evidence in the light most favorable to the non-movant, must refrain from making credibility determinations and weighing the evidence, and must draw all legitimate inferences in favor of the non-movant. Id. at 255. "Where parties file cross-motions for summary judgment, each summary judgment motion must be evaluated independently to determine whether a genuine issue of material fact exists and whether the movant is entitled to judgment as a matter of law." Progressive Cas. Ins. Co. v. Morton, 140 F. Supp. 3d 856, 860 (E.D. Mo. 2015) (citations omitted).

III. **Discussion**

In its motion, Olin argues that there was no contract between Olin and ARG for the sale of caustic soda in April 2020. Specifically, it argues that the parties negotiated a contract but that it was neither signed nor executed in any other manner. In response, ARG argues that they verbally agreed to the sale of caustic soda, as was their long-term practice and prior course of dealing, but that Olin reneged on the agreement for a nefarious reason, to compel ARG to take on a $1.2 million debt owed to Olin by LAlumina. In its motion, which seeks judgment on Counts II and IV (breach of contract and promissory estoppel, respectively), ARG argues that a contract was formed based on the emails, which constitute a writing, that Olin made a written offer that ARG verbally accepted, and that by failing to deliver the barges, Olin breached the contract and caused damages. In response, Olin again argues that no contract was formed and that, in any event, it is a question of material fact as to whether a contract was formed.

**A. Breach of Contract and related Counts (Counts I, II, and III)**

In order to prevail on a breach of contract claim, ARG must first show that there is a valid and binding contract. Grandoe Corp. v. Gander Mountain Co., 761 F.3d 876, 882 (8th Cir. 2014) ("This question of contract formation precedes any question about the legal effect of the contract's terms."). A contract is valid and enforceable if there is an offer, acceptance, and consideration. Johnson v. McDonnell Douglas Corp., 745 S.W.2d 661, 662 (Mo. 1988); Sansone L., LLC v. J&M Sec., LLC, 589 S.W.3d 74, 86 (Mo. Ct. App. 2019); Ketcherside v. McLane, 118 S.W.3d 631, 635 (Mo. Ct. App. 2003) ("The essential elements of a contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation" (quotation marks and citation omitted)).[8] If there are facts in dispute, the existence of a contract is a question of fact; however, if there are no facts in dispute, the existence of a contract is a question of law. O.R.S. Distilling Co. v. Brown-Forman Corp., 972 F.3d 924, 925-926 (8th Cir. 1992).

Olin argues that an offer was made on April 2nd when Garber requested a purchase order from ARG after ARG had contacted its supply chain to arrange for the barges. However, a jury could find that the offer came earlier, with the March 26th email wherein Garber indicated that Olin was ready and willing to supply 3-4 barges in April at $254.00 per DMT. With that email, Olin made a "definite offer" to provide the caustic soda that ARG requested and provided the essential terms: what, when, how, amount, and price. These terms were essential because they were the only terms that Garber and Mayer discussed during negotiations and the only terms attached to a cover sheet on a subsequent form contract as set forth below. See Matthes v. Wynkoop, 435 S.W.3d 100, 107 (Mo. Ct. App. 2014) (whether a term is material "depends on the

---

[8] The parties do not dispute that Missouri substantive law governs.

agreement and its context and also on the subsequent conduct of the parties, including the dispute which arises and the remedy sought" (quotation marks and citations omitted)).

In any event, regardless of when an offer was made, there is a question of fact as to whether the offer was accepted: ARG argues that Mayer verbally accepted the March 26th offer[9] but Garber states that no verbal acceptance was made and that, in fact, a counteroffer was made that never was accepted.  Pride v. Lewis, 179 S.W.3d 375, 379 (Mo. App. Ct. 2005) ("A contract does not exist without a definite offer and a mirror-image acceptance.").  A jury may also find that ARG accepted the offer by contacting Olin's logistics to arrange for the barges.  See Mo. Ann. Stat. § 400.2-204(a) (West) ("A contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").  But a jury may also find that there was no contract because Olin requested a purchase order at the new price prior to acting and ARG requested a contract prior to submitting a purchase order.  (Doc. 27-3, p. 11).  See Kunzie v. Jack-In-The-Box, Inc., 330 S.W.3d 476, 484 (Mo. Ct. App. 2010) (noting that an acceptance must be "positive and unambiguous" and that the offeree must "objectively manifest the [ ] intent to be presently bound"); Pride v. Lewis, 179 S.W.3d 375, 379 (Mo. Ct. App. 2005) ("Any acceptance that includes new or variant terms from the offer presented amounts to a counter-offer and a rejection of the original offer." (quotation marks and citations omitted)).

The Court is mindful that ARG argues that the written form contract and purchase order are just formalities that did not affect the essential terms of an already agreed upon verbal contract.

---

[9] Olin argues that ARG did not state in its complaint that Mayer verbally accepted the offer on March 27th and cites to Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees, 558 F.3d 731, 735 (8th Cir. 2009), for the proposition that "plaintiff could not raise a fact at summary judgment which was not contained in his complaint" (Doc. 38, pp. 12-13).  Olin's reading of Satcher is overly expansive.  In that employment discrimination and retaliation case, the Eighth Circuit stated that the plaintiff could not expand his retaliation claim by arguing facts not contained in his complaint.  This matter is not an employment case subject to various unique waiver and statute of limitations considerations.

Hunt v. Dallmeyer, 517 S.W.2d 720, 724 (Mo. App. 1974) ("The mere fact that parties contemplate a formal written draft of their agreement at a later time is not sufficient in itself to demonstrate that they did not intend to be bound at the time of their original agreement."); See also Shapleigh Inv. Co. v. Miller, 193 S.W.2d 931 (Mo. App. 1946) (noting that various phrases indicating that a written contract will be drafted do not negate an agreement). The written form contract sent by Garber to Mayer on April 2 (Doc. 27-3, pp. 13-15) appears to be identical to the written form contract used for spot transactions sent by Garber to Mayer on July 15, 2019 except for a cover sheet identifying the specific elements of the current deal and containing a block for signatures (Doc. 31-9, pp. 7-8).

On the other hand, Olin argues the April 2nd request for a written contract, the terms of which ARG wanted to "review" for agreement prior to issuing a purchase order, represents a counteroffer and/or an indication of how Olin's offer would be accepted – only through a written negotiated contract and accompanying purchase order. Id. 517 S.W.2d at 724 ("If there is intent not to be bound [by oral agreements], it must be specifically set out in their original agreement."). Thus, in his email to Garber, Mayer states that "[o]nce we have agreed on contract terms and wording" he would send a purchase order. An inference to be drawn is that Mayer wanted to modify the form contract (of which he was familiar) and that those modifications may have been essential to ARG's agreement. As such, "[t]he real question is whether the parties intended a written document to be a condition precedent to the formation of a binding contract." Int'l Casings Grp, Inc. v. Premium Standard Farms, Inc., 358 F.Supp. 863, 871 (W.D. Mo. 2005) (citations omitted). A jury may reasonably find that ARG's silence upon receipt of the contract indicated that no agreement had been reached. Pride, 179 S.W.3d at 379 ("As a general rule, silence or inaction cannot constitute acceptance of an offer."). Therefore, because there is a question of fact

as to whether a contract was formed, summary judgment cannot be granted in favor of ARG on its claim of breach of contract (Counts II).

Our inquiry does not end there. Missouri's Statute of Frauds provides:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(2) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of subsection (1) against such party unless written notice of objection to its contents is given within ten days after it is received.

(3) A contract which does not satisfy the requirements of subsection (1) but which is valid in other respects is enforceable

    (a) if the goods are to be specially manufactured for the buyer and are not suitable for sale to others in the ordinary course of the seller's business and the seller, before notice of repudiation is received and under circumstances which reasonably indicate that the goods are for the buyer, has made either a substantial beginning of their manufacture or commitments for their procurement; or

    (b) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

    (c) with respect to goods for which payment has been made and accepted or which have been received and accepted (section 400.2-606).

Mo. Ann. Stat. § 400.2-201 (West)

There is no question that the transaction at issue involved the sale of goods and is governed by the Statute of Frauds. To satisfy the writing requirement, the writing must "evidence an agreement to sell goods; that the writing be signed by the party to be charged; and that the quantity be specified.

Vess Beverages, Inc. v. Paddington Corp., 886 F.2d 208, 214 (8th Cir. 1989).  Certainly, it is reasonable to conclude that the emails, which contain all the essential terms of the agreement, are a writing as contemplated by the Statute of Frauds.  Eagle Tech. v. Expander Americas, Inc., 783 F.3d 1131, 1138 (8th Cir. 2015); Int'l Casings Grp., Inc. v. Premium Standard Farms, Inc., 358 F. Supp. 2d 863, 872 (W.D. Mo. 2005); See also, Cloud Corp. v. Hasbro, Inc., 314 F.3d 289, 296–297 (7th Cir. 2002); Mo. Stat. App § 400.1-201(b)(43) (West) (defining "writing" to include "printing, typewriting, or any other intentional reduction to tangible form.").  Therefore, Olin's argument that a formal written contract (like the form contract it e-mailed to Mayer) is necessary to satisfy the statute of frauds is unavailing.

Whether or not these writings are "signed by the party to be charged" is a trickier question.  Olin argues that an actual signature on the written contract itself is necessary to satisfy the statute of frauds.  ARG argues that the emails themselves contain "signature blocks" that are sufficient.  To satisfy the statute, "it must be shown that the party against whom enforcement is sought, . . . signed a memorandum evidencing the essential terms of the oral agreement."  Olson v. Curators of Univ. of Missouri, 381 S.W.3d 406, 413 (Mo. Ct. App. 2012).   "The signature may take many forms and be located anywhere in the writing, so long as it conveys an intention to authenticate the writing."  Vess Beverages, Inc., 886 F.2d at 213; Eagle Technology, 783 F.3d at 1138 (holding that emails containing an "electronic signature" are sufficient to satisfy the statute of frauds).  And, Missouri's Uniform Electronic Transactions Act ("UETA"), Mo. Stat. App. § 432.200, et seq., defines an electronic signature as "[a]n electronic sound, symbol, or process attached to or logically associated with a record an executed or adopted by a person with the intent to sign the record."  Id. § 432.205(8).  Thus, if Garber's name as set forth in his emails are considered signatures pursuant to the UCC, then the statute of frauds is satisfied.

The Court finds that the emails, containing Garber's name on the header of the email and an italicized "signature" at the bottom of his emails with his contact information are sufficient "authentication which identifies the party to be charged" and satisfy the signature requirement.[10] See Mo. Stat. Ann § 400.2-201 (West) (Comment 1)[11]; See also Cloud Corp., 314 F.3d at 295–6; Lamle v. Mattel, Inc., 394 F.3d 1355, 1362 (Fed. Cir. 2005) (finding that a typed name at the bottom of an email is a sufficient signature under the UETA and California common law). There is no evidence that Garber's emails are not authentic or that they do not reflect the communications or agreements between the Garber and Mayer. And, while all of the emails do not contain a header and footer, when logically taken in combination, they demonstrate Olin's intention to be bound by an agreement to provide caustic soda to ARG in April for a set price. Mayer v. King Cola Mid-Am., Inc., 660 S.W.2d 746, 748 (Mo. Ct. App. 1983) ("When separate documents are relied on to establish the existence of an agreement, they must be connected by express reference to one another or by clear implication established through their respective contents."); See also Vess Beverages, Inc. v. Paddington Corp., 941 F.2d 651, 654 (8th Cir. 1991) ("Even if only one of the documents is signed, the requirement is satisfied as long as one document refers to the other, or their contents clearly show they are related."). There is no question that the emails satisfy the main purpose of the statute of frauds, which is to prevent fraud that can be inherent in purely oral agreements. See Zink v. Pittsburg & Midway Coal Min. Co., 374 S.W.2d 158, 163 (Mo. App. 1964) ("The purpose of the statute of frauds is to guard against the perjury which might be induced by the ease of establishing obligations by word of mouth."). To the extent that a jury were to find

---

[10] Of course, this finding is contingent upon a jury finding that there was an actual contract based on the oral acceptance urged by ARG.

[11] The UCC defines "signed" as "using any symbol executed or adopted with present intention to adopt or accept a writing." Mo. Stat. Ann. §400.1-201(b)(37) (West).

that a contract existed between Olin and ARG, the statute of frauds is not offended by the written agreement in the form of emails authenticated by the sender's name at the footer and header of the emails.[12]

Accordingly, judgment cannot be granted in favor of Olin on Counts I, II, and III on the record before the Court.

### B. Promissory Estoppel

The elements of promissory estoppel are set forth succinctly by the Missouri Supreme Court:

> A claim of promissory estoppel has four elements: (1) a promise; (2) on which a party relies to his or her detriment; (3) in a way the promisor expected or should have expected; and (4) resulting in an injustice that only enforcement of the promise could cure. The promise giving rise to the cause of action must be definite, and the promise must be made in a contractual sense.  In Missouri, promissory estoppel is not a favorite of the law, and each element must clearly appear and be proven by the party seeking its enforcement. Clevenger v. Oliver Ins. Agency, Inc., 237 S.W.3d 588, 590 (Mo. 2007).

In this case, ARG is not seeking specific enforcement of a promise (e.g. delivery of the caustic soda); rather it is seeking damages, in part for the difference between what it actually paid for caustic soda and what it would have paid Olin.  Thus, it has an adequate remedy at law for breach of contract and is not entitled to judgment on this claim (Count IV). Id. at 591; Zipper v. Health Midwest, 978 S.W.2d 398, 411–2 (Mo. Ct. App. 1998) ("Generally, equity will not interceded if an adequate remedy at law exists.").  Moreover, judgment must be granted in favor of Olin because

---

[12] Olin cites to WCT & D, LLC v. City of Kansas City, 476 S.W.3d 336, 342 (Mo. Ct. App. 2015), for the proposition that Missouri Courts would reject a theory under the UETA that an automated signature block would serve as a signature regardless of intent.  In that case, the parties had not agreed to communicate electronically, the person whose name appeared at the bottom of the subject email did not represent the company that was purportedly bound by the statements contained therein and did not have authority to bind the company, nor was there any evidence of intent for the name to serve as a signature.  In this case, there is no question that Garber was authorized to bind Olin, that his emails are authentic and his own writing, and that the parties had engaged in similar electronic communications in the past.  At the very least, it is a question of fact as to whether he intended the emails to represent binding contractual terms.  See International Casings Group, Inc., 358 F. Supp. 2d at 873 n. 13 (W.D. Mo. 2005).

ARG *is* seeking money damages, a demonstration that there *are* remedies at law available.  See Watterson v. Wilson, 2021 WL 3354107 (Mo. Ct. App. Aug. 3, 2021) (granting judgment for defendant on a promissory estoppel claim where plaintiff sought damages); Birkenmeier v. Keller Biomedical, LLC, 312 S.W.3d 380 (Mo. Ct. App. 2010) (same).

### IV.    Conclusion

For the foregoing reasons, Olin's Motion for Summary Judgment (Doc. 25) is **GRANTED in part and DENIED in part** and ARG's Motion for Partial Summary Judgment (Doc. 32) is **DENIED**.  Judgment is granted in favor of Defendant on Count IV (promissory estoppel).  The Clerk of Court shall enter judgment accordingly at the conclusion of this matter.

  */s/ John M. Bodenhausen*
**JOHN M. BODENHAUSEN**
**UNITED STATES MAGISTRATE JUDGE**

Dated this 1st day of November, 2021